## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAMION DAVIS, | : | |
| | : | |
| Plaintiff, | : | No. 4:23-cv-1896 |
| | : | |
| v. | : | (Judge Munley) |
| | : | (Magistrate Judge Arbuckle) |
| CRAIG LOWE, Warden; | : | |
| MICHAEL FAGAN, Lieutenant; | : | JURY TRIAL DEMANDED |
| TODD SCHWEYER, Lieutenant; | : | |
| LINDA FORSHAY, Sergeant; | : | |
| KEVIN WAGENHOFFER, Sergeant; | : | |
| FITZPATRICK, Corrections Officer; | : | |
| MAURER, Corrections Officer; | : | |
| D. SMITH, Corrections Officer; | : | |
| DR. MARTHA TURNBERG; | : | |
| MELISSA KLEMM; | : | |
| JAIMEE HUTSON; | : | |
| PRIMECARE MEDICAL, INC.; | : | |
| | : | |
| Defendants. | : | |

## AMENDED COMPLAINT

### INTRODUCTION

1.     Plaintiff Damion Davis, a person being detained by the United States Immigration and Customs Enforcement ("ICE"), brings this action for damages pursuant to 42 U.S.C. § 1983, against various correctional and medical staff at the Pike County Correctional Facility ("PCCF") for depriving him of his rights guaranteed by the First and Fourteenth Amendments of the United States Constitution and Pennsylvania law.

2.     While Mr. Davis was detained in PCCF, multiple corrections officers placed him in restraints and then sprayed him in the face and eyes with pepper spray in response to a disagreement between Mr. Davis and a corrections officer regarding a minor alleged rule violation.

3.     Subsequently, corrections officers placed Mr. Davis in a restraint chair, in a particularly painful position, and left him in the chair for approximately ten hours, with the acquiescence of medical personnel.

4.     While Mr. Davis was fully restrained in the chair, corrections officers entered the room and choked him until he was spitting blood, while one officer called him the n-word. When Mr. Davis said he could not breathe, another officer asked him if he thought he was George Floyd.

5.     Medical personnel observed Mr. Davis while he was in the restraint chair tilted at an uncomfortable angle for multiple hours and saw Mr. Davis's blood on the wall of the room, but they failed to intervene to alleviate his suffering.

6.     As a result of the pepper spray, Mr. Davis experienced lasting damage to his eyesight.

7.     Mr. Davis filed grievances and other complaints relating to the incident, and staff members retaliated against him by keeping him in solitary confinement for the next six months, seeking to deter him from holding them accountable for violating his rights.

8.    Still traumatized by these events, and still experiencing their physical effects, Mr. Davis brings this action to vindicate his rights, hold the perpetrators accountable, and obtain compensation for his injuries.

## JURISDICTION AND VENUE

9.    Plaintiff brings this action pursuant to 42 U.S.C. § 1983. The Court, therefore, has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4).

10.    The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to adjudicate Plaintiff's state law claims.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in Pike County, Pennsylvania, which is in the Middle District of Pennsylvania.

## PARTIES

12.    Plaintiff Damion Davis is a forty-four-year-old Black man who, at the age of eleven, moved from Jamaica to join his father in the United States. He has been detained by ICE since 2019 and was held in PCCF as an immigration detainee from March 2021 to May 2022.

13.    Defendant Craig Lowe was employed at PCCF as the Warden during all times relevant to this case.

14.    Defendant Michael Fagan was employed at PCCF as a corrections officer during all times relevant to this case and had the rank of lieutenant.

15.    Defendant Todd Schweyer was employed at PCCF as a corrections officer during all times relevant to this case and had the rank of lieutenant.

16.    Defendant Linda Forshay was employed at PCCF as a corrections officer during all times relevant to this case and had the rank of sergeant.

17.    Defendant Kevin Wagenhoffer was employed at PCCF as a corrections officer during all times relevant to this case and had the rank of sergeant.

18.    Defendant Fitzpatrick was employed at PCCF as a corrections officer during all times relevant to this case.

19.    Defendant Maurer was employed at PCCF as a corrections officer during all times relevant to this case.

20.    Defendant D. Smith was employed at PCCF as a corrections officer during all times relevant to this case.[1]

21.    Defendant Martha Turnberg worked at PCCF as a physician during all times relevant to this case, and, upon information and belief, she was an employee of PrimeCare Medical, Inc. She is licensed by the Commonwealth of Pennsylvania as a Physician.

22.    Defendant Melissa Klemm worked at PCCF as a nurse during all times relevant to this case, and, upon information and belief, she was an employee of

---

[1] Plaintiff does not know the first names or first initials of Defendants Fitzpatrick and Maurer. Plaintiff does not know the first name of Defendant D. Smith.

PrimeCare Medical, Inc. She is licensed by the Commonwealth of Pennsylvania as a Registered Nurse.

23.     Defendant Jaimee Hutson worked at PCCF as a nurse during all times relevant to this case, and, upon information and belief, she was an employee of PrimeCare Medical, Inc. She is licensed by the Commonwealth of Pennsylvania as a Practical Nurse.

24.     Defendant PrimeCare Medical, Inc., which has a principal place of business in Harrisburg, PA, was, at all times relevant to this case, the holder of a contract with Pike County to provide medical and mental health services to people incarcerated at PCCF.

25.     All Defendants are being sued in their individual capacities.

## STATEMENT OF FACTS

### Events Preceding Defendants' Use of Force

26.     Mr. Davis was incarcerated in PCCF as an immigration detainee from March 2021 until his transfer to the Buffalo Federal Detention Facility in Batavia, New York, in May 2022.

27.     On the evening of December 2, 2021, Mr. Davis wrote a letter to his wife, sealed it inside a homemade envelope, and gave it to a corrections officer to be mailed.

28.    The corrections officer on duty in Mr. Davis's cellblock subsequently informed Mr. Davis that the use of a homemade envelope violated PCCF rules and told Mr. Davis that, as a consequence, he would receive a disciplinary write-up and be locked down in his cell for twenty-four hours.

29.    No rule listed in the PCCF Inmate/Detainee Handbook prohibited the use of homemade envelopes.

30.    Mr. Davis did not agree that he had violated any PCCF rules and requested the involvement of a corrections officer with a higher rank.

31.    Defendant Forshay, a sergeant, was the shift commander for the shift that began around 3:00 p.m. and ended around 11:00 p.m. on December 2, 2021.

32.    Defendant Forshay approached Mr. Davis's cell along with other corrections officers, including Defendants Fitzpatrick and Maurer.

33.    Defendant Forshay directed Defendants Fitzpatrick and Maurer to cuff Mr. Davis's hands and shackle his ankles.

34.    Defendants Fitzpatrick and Maurer placed handcuffs and shackles on Mr. Davis, tightening the restraints to the point of causing Mr. Davis significant pain in his wrists and ankles.

35.    Defendant Forshay told Mr. Davis that she was taking him to the "municipal room," a multipurpose room frequently used for classes and programs for incarcerated people, in order to discuss his use of the homemade envelope.

6

36.     As Defendants Forshay, Fitzpatrick and Maurer walked Mr. Davis past the door to the municipal room and continued down the hallway, Mr. Davis noticed that Defendants Fagan and Wagenhoffer had joined the group of corrections officers surrounding him.

37.     Defendant Fagan, a lieutenant, was the shift commander for the shift that began around 11:00 p.m. on December 2, 2021, and ended around 7:00 a.m. on December 3, 2021.

38.     Defendant Wagenhoffer, a sergeant, was the shift supervisor for the shift that began around 11:00 p.m. on December 2, 2021, and ended around 7:00 a.m. on December 3, 2021.

39.     Mr. Davis was concerned that the presence of Defendants Fagan and Wagenhoffer and the large number of corrections officers surrounding Mr. Davis meant that something other than a discussion of facility rules was going to happen to him.

### Defendants Slam Mr. Davis into the Wall

40.     As they passed the door to the municipal room, Mr. Davis asked Defendant Forshay where he was being taken.

41.     Defendant Forshay responded by telling Defendants Maurer and Fitzpatrick to pin him against the wall "until he shuts up."

42.     Defendants Maurer and Fitzpatrick slammed Mr. Davis into the wall.

7

43.    Because Mr. Davis's hands were cuffed behind his back and his ankles were shackled, he was off balance and unable to use his hands and arms to protect himself.

44.    Although Mr. Davis did not physically resist the corrections officers, he continued to ask where he was being taken.

45.    Defendant Forshay again directed Defendants Maurer and Fitzpatrick to put Mr. Davis against the wall.

46.    Defendants Maurer and Fitzpatrick again slammed Mr. Davis into the wall with sufficient force to cause his head to hit the wall, resulting in significant pain.

47.    Defendants Fagan and Wagenhoffer were present while Defendants Mauer and Fitzpatrick twice slammed Mr. Davis into the wall and were aware of the ongoing improper conduct of their fellow officers, whom they outranked, but did nothing to intervene to prevent the ongoing use of excessive force against Mr. Davis.

### Defendants Pepper-Spray Mr. Davis and Slam Him into the Floor

48.    Defendants Fagan, Forshay, Wagenhoffer, Fitzpatrick, and Maurer, along with additional corrections officers, took Mr. Davis to PCCF's intake room.

49.    When they stepped inside the intake room, Defendant Fagan ordered Mr. Davis to take off his clothing and put on an orange jumpsuit.

50.     Mr. Davis pointed out that he was unable to undress because his hands were cuffed and his ankles were shackled.

51.     Defendant Fagan then ordered Defendant Wagenhoffer to pepper-spray Mr. Davis.[2]

52.     Mr. Davis, who was in handcuffs and leg shackles and surrounded by multiple corrections officers, posed no threat to anyone.

53.     Deploying pepper spray against him thus served no legitimate purpose and was entirely unjustified.

54.     Defendant Wagenhoffer nonetheless sprayed a large quantity of pepper spray into Mr. Davis's face.

55.     The pepper spray caused Mr. Davis to feel an intense burning sensation on his skin and in his eyes.

56.     Mr. Davis had difficulty breathing and was unable to see clearly because his eyes had teared up.

57.     Mr. Davis requested the presence of an ICE officer, but his request was ignored.

58.     Defendants Fitzpatrick and Maurer slammed Mr. Davis into the floor.

59.     Defendant Wagenhoffer placed his knee on Mr. Davis's back, grabbed Mr. Davis by his hair, and sprayed more pepper spray directly into Mr. Davis's eyes.

---

[2] Pepper spray is also known as "oleoresin capsicum," "OC," and "OC spray."

60.     Defendants Fitzpatrick and Maurer picked Mr. Davis up and put him on a stool.

61.     Defendant Fagan told Mr. Davis to get in the shower.

62.     Mr. Davis believed that Defendant Fagan's order to get in the shower was intended to cause Mr. Davis additional pain, as Mr. Davis believed that water exacerbates the effects of pepper spray.

63.     Mr. Davis therefore did not get in the shower.

64.     Defendants Maurer and Fitzpatrick again slammed Mr. Davis into the floor.

65.     Defendant Fagan ordered Defendant Wagenhoffer to pepper-spray Mr. Davis again if he didn't undress.

66.     Mr. Davis was unable to comply because his ankles were shackled, he was lying on the floor, and he was in extreme pain from the pepper spray.

67.     Defendants again sprayed Mr. Davis with pepper spray.

68.     Mr. Davis felt like his face was on fire, and he experienced intense pain in his eyes.

69.     In addition to physical pain, as a result of Defendants' actions, Mr. Davis was experiencing extreme and obvious emotional distress, including fear and humiliation.

70.    Defendant Fagan told the other corrections officers present to hold Mr. Davis down.

71.    Corrections officers cut Mr. Davis's clothes off him, including his underwear, so that he was completely naked.

72.    Defendant Fagan told corrections officers to "get the chair."

73.    At Defendant Fagan's direction, corrections officers then strapped Mr. Davis into a restraint chair.

74.    The restraint chair had straps that came down across Mr. Davis's shoulders and locked at his groin, straps that immobilized his arms, and straps that went around each leg.

75.    Mr. Davis, who was still completely naked and uncovered, heard Defendant Forshay laughing and saw Defendant Forshay standing directly in front of him.

76.    Mr. Davis yelled that it violated the Prison Rape Elimination Act for Defendant Forshay, a woman, to see him naked.

77.    Defendant Forshay and other corrections officers laughed.

78.    Mr. Davis again requested the presence of an ICE officer.

79.    In response, Defendant Fagan said that Mr. Davis was suicidal.

80.    Mr. Davis did not say that he was suicidal and did not behave in any way that would indicate that he was suicidal.

81.    Mr. Davis told Defendant Fagan that he was not suicidal.

82.    Defendant Forshay immediately said that she had heard Mr. Davis say that he was suicidal.

83.    Defendants Fagan and Forshay falsely stated Mr. Davis was suicidal as a pretext for putting him in the restraint chair.

84.    Despite Mr. Davis's repeated requests that Defendant Fagan call a medical staff person to wash the pepper spray out of Mr. Davis's eyes, Defendant Fagan delayed requesting medical attention for Mr. Davis.

### Defendants Choke Mr. Davis and Keep Him in the Restraint Chair for Approximately Ten Hours

85.    Corrections officers wheeled the restraint chair with Mr. Davis in it to an observation cell.

86.    The temperature of the observation cell was cold—much colder than other cells at PCCF—and uncomfortable for a person without adequate clothing.

87.    Mr. Davis was completely naked except for a blanket laid across his lap.

88.    On Defendant Fagan's order, corrections officers lifted and wedged the back legs of the restraint chair against the bed in the observation cell in a manner that caused the restraint chair to tilt forward such that Mr. Davis was pressed against the straps and buckles of the restraint chair.

89.     The angled placement of the restraint chair caused significant strain on Mr. Davis's shoulders, decreased blood circulation to his hands, and caused him pain.

90.     After some time passed, Defendants Fagan, Wagenhoffer, Smith, and three additional corrections officers entered the observation cell wearing riot gear, including padded suits and helmets.

91.     Defendant Forshay stood outside the observation cell holding a video camera.

92.     Mr. Davis, who is Black, was immediately concerned for his safety because Defendant Smith had repeatedly and regularly called him the n-word in the preceding months, almost every time he saw him.

93.     Mr. Davis believed that Defendants Fagan, Wagenhoffer, and Smith had entered the cell for the purpose of showing the other corrections officers present how to put a Black man in his place.

94.     Defendant Fagan directed Defendants Wagenhoffer and Smith and the additional corrections officers to remove Mr. Davis from the restraint chair.

95.     Defendant Smith winked at Mr. Davis, then began pulling Mr. Davis's leg against the restraint chair strap in a manner calculated to cause Mr. Davis pain, all the while smiling at Mr. Davis.

96.    At no time during this interaction did Defendant Smith attempt to undo the restraint chair strap or take any other action directed at freeing Mr. Davis from the restraint chair.

97.    Defendant Wagenhoffer put his hands around Mr. Davis's neck and squeezed.

98.    Mr. Davis's limbs were fully restrained and he had no ability to protect himself.

99.    Mr. Davis screamed that he couldn't breathe.

100.    Defendant Smith responded, "Shut up, [n-word]," and the other corrections officers present laughed.

101.    Defendant Wagenhoffer said something along the lines of, "Who do you think you are? George Floyd?"

102.    George Floyd was a Black man whose murder by Minneapolis police officers in May 2020 was captured on video and sparked protests for racial justice and against police brutality around the country and world.

103.    While a police officer knelt on his neck for more than 9 minutes, George Floyd can repeatedly be heard on the video saying that he could not breathe.

104.    Defendant Wagenhoffer continued to squeeze Mr. Davis's neck.

105.    Mr. Davis experienced tunnel vision and tasted blood in his mouth.

106.    Mr. Davis began spitting up blood.

107.    Defendant Wagenhoffer released Mr. Davis, but Mr. Davis continued to throw up blood.

108.    A corrections officer said something along the lines of, "That's what you get for not following facility rules."

109.    Defendants Fagan, Forshay, and Smith saw Defendant Wagenhoffer squeezing Mr. Davis's neck, heard Mr. Davis screaming that he could not breathe, and saw Mr. Davis spitting blood, but they did not do anything to stop Defendant Wagenhoffer.

110.    Mr. Davis remained in the restraint chair for approximately nine to eleven hours.

111.    Defendant Schweyer, a lieutenant, was the shift commander for the shift that began around 7:00 a.m. on December 3, 2021.

112.    On the morning of December 3, 2021, Defendant Schweyer spoke with Mr. Davis while he was in the restraint chair.

113.    Defendant Schweyer took no immediate action to remove Mr. Davis from the chair despite having the authority to do so, as the shift commander.

114.    During the approximately nine to eleven hours that Mr. Davis spent in the restraint chair, the restraint chair remained wedged against the bed and tilted forward.

115.    As a result of Defendants' actions, Mr. Davis experienced extreme and obvious emotional distress, including fear and humiliation, while he was in the restraint chair.

## Medical Personnel Employed at PCCF Bear Responsibility for the Harm Mr. Davis Suffered in the Restraint Chair

116.    At some time after Mr. Davis was placed in the restraint chair, Defendant Fagan summoned Defendant Hutson to wash the pepper spray from Mr. Davis's eyes.

117.    Defendant Hutson observed that Mr. Davis's left eye was swollen shut and his vision was severely compromised in his right eye.

118.    After examining Mr. Davis's eyes, Defendant Hutson told Defendant Fagan that he had waited too long to obtain medical attention for Mr. Davis.

119.    The version of PCCF Policy 1016: Use of Restraints ("Policy 1016") in effect at the time required that medical staff check Mr. Davis's breathing and other vital signs every 15 minutes while he was in the restraint chair.

120.    The applicable standard of care regarding restraints also dictated that medical staff should check Mr. Davis's breathing and other vital signs every 15 minutes while he was in the restraint chair.

121.    Defendant Hutson, in her capacity as a nurse, was tasked with monitoring Mr. Davis's physical condition and vital signs while he was in the

restraint chair, from the initial placement on the night of December 2, 2021 through approximately 7:00 a.m. on December 3, 2021.

122.   During the period of time that Defendant Hutson was responsible for monitoring Mr. Davis's physical condition, she did not check his blood pressure or monitor his pulse on a regular basis.

123.   Defendant Klemm, in her capacity as a nurse, was tasked with monitoring Mr. Davis's physical condition and vital signs while he was in the restraint chair from approximately 7:00 a.m. to 9:35 a.m. on December 3, 2021.

124.   During the period of time that Defendant Klemm was responsible for monitoring Mr. Davis's physical condition, she did not check his blood pressure or monitor his pulse on a regular basis.

125.   No other correctional or medical staff member checked Mr. Davis's blood pressure or monitored his pulse on a regular basis while he was in the restraint chair either.

126.   Nonetheless, Mr. Davis's PrimeCare medical records falsely state that his blood pressure was read and recorded twelve times and his pulse/respirations were measured and recorded eleven times while he was in the restraint chair.

127.   Upon information and belief, Defendants Hutson and Klemm falsified Mr. Davis's medical records, recording blood pressure and pulse/respirations readings that had not actually been taken.

128.   Policy 1016 dictated that medical staff should determine how an individual placed in a restraint chair should be positioned.

129.   Defendants Hutson and Klemm saw the unusual and unjustified placement of the restraint chair legs against the bed, the increased strain on Mr. Davis's body caused by the forward tilt of the restraint chair, and the decreased blood circulation to Mr. Davis's hands, which was exacerbated by the forward tilt of the restraint chair.

130.   Defendants Hutson and Klemm saw that Mr. Davis was naked, but for a blanket tucked precariously around his hips.

131.   After Defendant Wagenhoffer squeezed Mr. Davis's neck, causing Mr. Davis to spit blood, Defendant Hutson saw blood on Mr. Davis's face and blood on the wall of the observation cell.

132.   Mr. Davis told Defendant Klemm that officers had choked him while he was fully restrained in the restraint chair and showed her the blood on his face and on the wall.

133.   Despite their awareness that Mr. Davis was being mistreated, Defendants Hutson and Klemm did nothing to try to alleviate Mr. Davis's pain, re-position him or the restraint chair, remove him from the restraint chair, get him clothing, or otherwise stop the ongoing abuse to which Mr. Davis was being subjected.

134.   PCCF Policy 1016 required that a health care provider obtain a doctor's order when the restraint chair was utilized.

135.   At or around 3:18 a.m. on December 3, 2021, after Mr. Davis had been in the restraint chair for approximately three to four hours, Defendant Turnberg, in her capacity as a physician, approved Mr. Davis's placement in the restraint chair.

136.   Defendant Turnberg approved Mr. Davis's restraint-chair placement despite Mr. Davis not presenting any threat to the physical safety of himself or others and the absence of any other circumstances that would have justified Mr. Davis's placement in the restraint chair.

137.   Defendant Turnberg did not observe, evaluate, or interact with Mr. Davis at all before approving his restraint-chair placement; she did not see him or speak to him either in person, over the phone, or via video.

138.   Policy 1016 prohibited the use of a restraint chair for more than eight hours without a doctor's order.

139.   At or around 7:27 a.m. on December 3, 2021, after Mr. Davis had been in the restraint chair for approximately eight hours, Defendant Klemm sought and obtained a doctor's order to keep Mr. Davis confined in the restraint chair despite Mr. Davis not presenting any threat to the physical safety of himself or others, and the absence of any other circumstances that would have justified Mr. Davis's continued placement in the restraint chair.

140.   At or around 7:27 a.m. on December 3, 2021, after Mr. Davis had been in the restraint chair for approximately eight hours, Defendant Turnberg authorized Mr. Davis's continued confinement in the restraint chair despite Mr. Davis not presenting any threat to the physical safety of himself or others and the absence of any other circumstances that would have justified Mr. Davis's continued placement in the restraint chair.

141.   Defendant Turnberg did not observe, evaluate, or interact with Mr. Davis before approving his continued placement in the restraint chair; she did not see him or speak to him either in person, over the phone, or via video.

## Mr. Davis's Restraint Chair Placement Was Unnecessary, Unreasonable, and Contrary to PCCF Policy

142.   Policy 1016 only permitted the use of the restraint chair with the approval of the Warden, Assistant Wardens, or their designee.

143.   Either Defendant Fagan, as shift commander, was the designee of the Warden or Assistant Wardens for purposes of authorizing restraint-chair placement, or, in the alternative, Defendant Fagan ordered Mr. Davis's placement in the restraint chair without the approval PCCF policy required.

144.   Policy 1016 stated that the restraint chair should be reserved for situations in which "an inmate/detainee presents imminent physical danger to themselves or others" and should be used "only in extreme instances and only when other types of restraints have proven ineffective."

20

145.   Mr. Davis made no attempts whatsoever to harm himself on December 2–3, 2021, and he did not do or say anything that would have caused a reasonable person to believe he presented an imminent physical danger to himself.

146.   Mr. Davis made no attempts whatsoever to harm others on December 2–3, 2021, and he did not do or say anything that would have caused a reasonable person to believe he presented an imminent physical danger to others.

147.   The use of handcuffs and shackles on December 2, 2021, not to mention the effects of a large amount of pepper spray applied directly to his face, fully and effectively restrained Mr. Davis and rendered him harmless such that the use of the restraint chair was wholly unnecessary.

148.   Policy 1016 also stated that "[u]nder no circumstances shall the inmate/detainee [in a restraint chair] remain naked or without cover (sheet or blanket) unless determined necessary by qualified health care personnel."

149.   No health care professional deemed it necessary for Mr. Davis to remain naked while he was in the restraint chair, and nothing about the circumstances justified Defendants keeping him naked.

150.   Policy 1016 explained in detail the procedures for placing an individual in a restraint chair, and it said nothing about elevating the rear legs of the chair so as to tilt it forward.

151.   Policy 1016 stated that "the inmate/detainee will be afforded the opportunity to utilize the toilet."

152.   While Mr. Davis was in the restraint chair, he made several requests to be allowed to urinate, but his requests were denied.

153.   Policy 1016 stated that "[i]f an inmate/detainee must be restrained for an extended period of time his/her extremities should be released on an alternating basis every 2 hours for a period of 5–10 minutes."

154.   While Mr. Davis was in the restraint chair, his extremities were not released regularly—and never for anywhere near 5–10 minutes—and he was given no opportunity to move or stretch his limbs.

155.    While Mr. Davis was in the restraint chair he was not offered any liquids or food.

156.   Defendants Fagan, Forshay, Wagenhoffer, and Schweyer, despite being either shift commanders or shift supervisors, and despite all interacting with Mr. Davis while he was in the restraint chair, did not provide Mr. Davis with clothing, water, an opportunity to use a toilet, or an opportunity to stretch his limbs for 5–10 minutes, as required by Policy 1016.

157.   Policy 1016 prohibited the use of a restraint chair for longer than was absolutely necessary.

158.    Policy 1016 directed the shift commander to remove a detainee from the restraint chair when the detainee was no longer a threat to himself or others.

159.    Defendant Fagan, a shift commander, failed to order the removal of Mr. Davis from the restraint chair, despite the lack of necessity for Mr. Davis's initial or continued placement in the restraint chair.

160.    Defendant Schweyer, a shift commander, failed to order the removal of Mr. Davis from the restraint chair, despite the lack of necessity for Mr. Davis's initial or continued placement in the restraint chair.

161.    Policy 1016 required approval from the Warden, Assistant Wardens, or their designee for continued use of the restraint chair after a detainee was under control.

162.    Either Defendant Fagan ordered or approved Mr. Davis's continued placement in the restraint chair, or, in the alternative, Defendants kept Mr. Davis in the restraint chair without securing the approval required by PCCF policy.

163.    Either Defendant Schweyer ordered or approved Mr. Davis's continued placement in the restraint chair, or, in the alternative, Defendants kept Mr. Davis in the restraint chair without securing the approval required by PCCF policy.

## The Lasting Harm Caused to Mr. Davis by Defendants
## on December 2–3, 2021

164.   Defendant Fagan delayed summoning Defendant Hutson to wash Mr. Davis's eyes, leaving Mr. Davis to sit in the restraint chair for at least half an hour without medical treatment.

165.   By the time Defendant Hutson washed the pepper spray out of Mr. Davis's eyes, Mr. Davis's left eye was swollen shut and Mr. Davis's ability to see out of his right eye was significantly compromised.

166.   On December 4, 2021, approximately 43 hours after Mr. Davis was pepper-sprayed, PCCF personnel took Mr. Davis to the Wayne Memorial Hospital Emergency Department.

167.    At Wayne Memorial Hospital, Mr. Davis was diagnosed with a corneal chemical burn in his left eye.

168.   Mr. Davis's ability to see out of his right eye remained significantly compromised for several weeks after he was pepper-sprayed.

169.   Mr. Davis remains unable to see clearly out of his left eye, nearly two years after Defendants pepper-sprayed him.

170.   As a result of being pepper-sprayed at PCCF, from the date of the incident through the present, Mr. Davis has experienced severe headaches, eye pain, and extreme sensitivity to light, including pain and headaches when exposed to bright lights.

171.   Mr. Davis was traumatized by the events of December 2–3, 2021, and he still experiences the effects of this trauma.

172.   Mr. Davis experiences anxiety as a result of Defendants' actions.

173.   As a result of Mr. Davis's confinement in the restraint chair on December 2–3, 2021, Mr. Davis experienced significant pain in his shoulders.

174.   Mr. Davis continues to experience pain and numbness that radiates from his shoulders to his hands.

175.   Mr. Davis is unable to sleep on his side because of the pressure this places on his shoulder, and he experiences pain sufficient to wake him from sleep if he inadvertently turns onto his side while sleeping.

**Defendants Hold Mr. Davis on Suicide Watch for At Least Three Days**

176.   Mr. Davis made no attempts whatsoever to harm himself on December 2–3, 2021, and he did not do or say anything that would have caused a reasonable person to believe he presented an imminent physical danger to himself.

177.   On December 2, 2021, Defendant Fagan falsely labeled Mr. Davis as suicidal in response to Mr. Davis's request for access to an ICE officer. *See supra* ¶¶ 79–84.

178.   On December 2, 2021, Defendant Forshay heard Mr. Davis's request for an ICE officer and Defendant's Fagan's announcement that Mr. Davis was

suicidal, and she responded by falsely stating that she had also heard Mr. Davis say that he was suicidal. *See supra* ¶¶ 79–84.

179.   After Mr. Davis was removed from the restraint chair on December 3, 2021, Defendant Lowe, PCCF's Warden, approved Mr. Davis's placement on suicide watch despite Mr. Davis not being suicidal.

180.   Upon information and belief, Defendant Lowe knew that Defendant Fagan's characterization of Mr. Davis as suicidal was a response to Mr. Davis's request for the presence of an ICE officer and/or his other complaints about his treatment.

181.   On December 3, 2021, Nicole Nocilla-Beckage, a licensed clinical social worker at PCCF, conducted a suicide risk assessment with Mr. Davis and concluded that he exhibited no suicidal risk factors.

182.   Ms. Nocilla-Beckage noted that Mr. Davis was placed on suicide watch by Defendant Lowe because of behavioral non-compliance.

183.   On December 4, 2021, Justin Lensbower, a licensed professional counselor at PCCF, conducted a suicide risk assessment with Mr. Davis and concluded that he had no significant mental health issues.

184.   Mr. Lensbower noted that Mr. Davis was placed on suicide watch by Defendant Lowe because of statements Mr. Davis made about feeling unsafe at PCCF.

185.  On December 5, 2021, Mr. Lensbower conducted another suicide risk assessment with Mr. Davis and again concluded that he had no significant mental health issues.

186.  On December 6, 2021, Ms. Nocilla-Beckage conducted another suicide risk assessment with Mr. Davis and again concluded that he exhibited no suicidal risk factors, stating that Defendant Lowe placed Mr. Davis on suicide watch after Mr. Davis reported fearing for his life due to a conflict with an officer.

187.  Despite repeated suicide risk assessments that found no evidence of suicidal thoughts or behavior, Mr. Davis remained on suicide watch, in the same cell where he had been in the restraint chair, for at least three days.

188.  While Mr. Davis was on suicide watch, he was deprived of clothing and given only a suicide smock to wear, a covering that was inadequate for the cold temperature of the observation cell.

189.  While Mr. Davis was on suicide watch, he was deprived of adequate writing materials, legal materials, and books.

190.  While Mr. Davis was on suicide watch, he suffered anxiety as a result of being unable to communicate with his family.

191.  While Mr. Davis was on suicide watch, he suffered embarrassment and humiliation at being forced to use a toilet and take care of other intimate bodily

functions in front of a video camera and glass window in full view of passing correctional officers.

192.   While Mr. Davis was on suicide watch, correctional officers pounded on his door during the night and woke him up approximately every fifteen minutes, depriving him of sleep.

193.   While Mr. Davis was on suicide watch, correctional officers refused to turn off the lights in his cell during the day, despite Mr. Davis explaining that his eyes were sensitive and the lights caused him pain, due to the injuries from the pepper spray.

194.   Defendant Lowe was aware of the conditions described in the preceding paragraphs because they were standard protocol for people on suicide watch.

195.   At no time during the period that Mr. Davis was on suicide watch did he attempt to harm himself, nor did he do or say anything that would have caused a reasonable person to believe he presented an imminent physical danger to himself.

## Defendants Forshay and Smith Retaliate Against Mr. Davis

196.   Mr. Davis filed an administrative grievance and grievance appeals in which he described the harm that was done to him on December 2–3, 2021, named Defendant Forshay and "Rovers" as people responsible for the harm he suffered, and sought compensatory and punitive damages.

197.  "Rovers" is a particular task designation for corrections officers at PCCF and would have been understood by Defendants to encompass Defendant Smith, along with other Defendants assigned to that task on December 2–3, 2021.

198.  Mr. Davis filed a Prison Rape Elimination Act ("PREA") complaint about his forced nudity in Defendant Forshay's presence on December 2, 2021.

199.  Throughout December 2021–March 2022, Mr. Davis filed additional grievances, grievance appeals, and "inmate request forms" in which he stated that the events of December 2–3, 2021 had not been investigated properly.

200.  Throughout December 2021–March 2022, Mr. Davis filed additional grievances and "inmate request forms" stating that corrections officers, including Defendants Forshay and Smith, were retaliating against him.

201.  Defendants Forshay and Smith were aware of Mr. Davis's numerous grievances and other submissions about their retaliation and the events of December 2–3, 2021, because they were identified by name in these grievances.

202.  Defendant Forshay, as a sergeant, also received and reviewed Mr. Davis's grievances.

203.  During the nine months of incarceration at PCCF that Mr. Davis experienced prior to the events of December 2–3, 2021, PCCF personnel initiated approximately one disciplinary action against Mr. Davis; he experienced a three-day

loss of privileges as a consequence, but he spent no time in the Restrictive Housing Unit ("RHU").

204.  From December 2021 to May 2022, PCCF personnel initiated at least eleven disciplinary actions against Mr. Davis.

205.  On at least one occasion during the period December 2021–May 2022, Defendant Forshay spoke to corrections officers, including Defendant Smith, during a shift meeting and discussed strategies for goading Mr. Davis to commit disciplinary infractions so that corrections officers could issue misconducts to Mr. Davis.

206.  Defendant Forshay, in her capacity as shift commander, reviewed many of the misconducts that corrections officers filed against Mr. Davis.

207.  The majority of the disciplinary actions filed against Mr. Davis between December 2021 and May 2022 resulted in sanctions for Mr. Davis of a specific number of days in the RHU.

208.  From the day in December that Mr. Davis was released from suicide watch until May 2022, when Mr. Davis was transferred to the Buffalo Federal Detention Facility, Mr. Davis remained in the RHU, in solitary confinement, as a result of misconduct charges filed against him.

209.  On January 11, 2022, Defendant Smith filed a Class I misconduct charge and two Class II misconduct charges against Mr. Davis, alleging that Mr.

Davis threatened to punch Defendant Smith in the face after Mr. Davis was released from jail.

210.   Mr. Davis did not threaten to punch Defendant Smith in the face.

211.   As a result of the January 11 misconduct charges filed by Defendant Smith, Mr. Davis's RHU time was extended by 30 days.

212.   On January 11, 2022, Defendant Smith called Mr. Davis the n-word.

213.   On another date in January 2022, Defendant Smith filed a Class I misconduct charge and two Class II misconduct charges against Mr. Davis, alleging that Mr. Davis threatened to kill him.

214.   Mr. Davis did not threaten to kill Defendant Smith.

215.   As a result of these misconduct charges, filed by Defendant Smith in January, Mr. Davis's RHU time was extended by an additional 30 days.

216.   While Mr. Davis was in the RHU, Defendant Smith told Mr. Davis that Mr. Davis would never see his wife or children again.

217.   On February 21, 2022, Defendant Forshay filed three Class II misconduct charges against Mr. Davis, alleging that Mr. Davis engaged in disruptive behavior and shouted insults at her.

218.   Mr. Davis did not shout insults at Defendant Forshay on February 21, 2022.

219. On February 21, 2022, several incarcerated people yelled out of concern for another incarcerated person who had expressed an intent to harm himself; among the people who yelled, Mr. Davis was singled out for punishment by Defendant Forshay.

220. As a result of this misconduct charge filed by Defendant Forshay, Mr. Davis's RHU time was extended by 3 days.

221. On February 23, 2022, Defendant Forshay assigned Defendant Smith to place shackles and handcuffs on Mr. Davis in order to accompany Mr. Davis to a legal call.

222. Mr. Davis refused to go with Defendant Smith because he observed that the shackles Defendant Smith held had an unusually short chain that would make it impossible for Mr. Davis to safely navigate stairs, and he did not trust Defendant Smith to prevent Mr. Davis from falling down the stairs.

223. As a result of Mr. Davis's refusal to comply with Defendant Smith's orders, Defendant Smith filed a Class I misconduct charge and two Class II misconduct charges against Mr. Davis, alleging that Mr. Davis threatened to kill him.

224. Mr. Davis did not threaten to kill Defendant Smith.

225. Defendant Forshay, in her capacity as shift commander, approved Defendant Smith's February 23, 2022 misconduct charges against Mr. Davis.

226.    While in the RHU, a solitary confinement unit, Mr. Davis lived in a small cell by himself and was not allowed to communicate with his wife and child.

227.    It has been widely acknowledged by courts, correctional officials, and others that solitary confinement, especially when imposed for prolonged periods of time, can cause grave psychological harm.

228.    For example, in 2017, the U.S. Court of Appeals for the Third Circuit "observed a growing consensus—with roots going back a century—that [solitary confinement] conditions . . . can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity," as well as physical harm, including suicide and self-mutilation.[3]

229.    Although Mr. Davis saw other people incarcerated in the RHU leaving their cells for daily recreation and exercise, Mr. Davis did not receive recreation or exercise time outside his cell during his time in the RHU.

230.    When other people incarcerated in the RHU received recreation time, they were placed in restraints while they were escorted to the yard, but then the restraints were removed.

---

[3] *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017) (citing *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 566–68 (3d Cir. 2017)).

231.    Occasionally, corrections officers offered Mr. Davis recreation time while he was in the RHU, but they told him that he would remain shackled and handcuffed while in the yard. He therefore declined the offers of "recreation" time.

232.    Some corrections officers allowed Mr. Davis to access the law library while he was in the RHU, but, on multiple occasions, Defendant Forshay refused his requests to access the law library, telling him it was a privilege that Mr. Davis did not deserve.

233.    The only times Mr. Davis was allowed out of his cell while he was in the RHU were for occasional visits to the law library, occasional phone calls with his attorneys, and showers, which he was permitted approximately every other day.

234.    During the time Mr. Davis spent in the RHU, he had difficulty focusing, experienced claustrophobia, and at times felt unable to breathe.

**Defendant Fagan Retaliates Against Mr. Davis**

235.    Mr. Davis filed an administrative grievance and grievance appeals in which he described the harm that was done to him on December 2–3, 2021, named Defendant Fagan as a person responsible for the harm he suffered, and sought compensatory and punitive damages.

236.    Mr. Davis filed a complaint with the Pennsylvania State Police at the Blooming Grove Barracks located in Hawley, Pennsylvania describing the harm that

was done to him on December 2–3, 2021 and naming Defendant Fagan as a person responsible for the harm he suffered.

237.  Mr. Davis's cell in the RHU had an overhead light and a light above the sink, both controlled by a switch that was not in Mr. Davis's cell and to which only corrections officers had access.

238.  The lights in Mr. Davis's cell remained on from early in the morning until late at night.

239.  While Mr. Davis was in the RHU, he frequently heard other incarcerated people request that corrections officers turn off the lights in their cells, saw corrections officers make a call to other officers, and saw the lights go off in those cells.

240.  During his time in the RHU, Mr. Davis made multiple requests to have the lights turned off in his cell, which were always refused by corrections officers.

241.  When Mr. Davis questioned why the lights in his RHU cell had to remain on, multiple corrections officers responded by telling him to ask the lieutenant.

242.  Upon information and belief, Defendant Fagan, who had the rank of lieutenant, told corrections officers to refuse Mr. Davis's requests to turn the lights off in his RHU cell.

243.   Because of his eye injuries from the pepper spray, of which Defendant Fagan and the staff on the RHU were aware, Mr. Davis's eyes were very sensitive to light, and the constant illumination caused him pounding headaches.

244.   On January 4, 2022, Defendant Klemm provided Mr. Davis with a medical restriction to permit him to have the lights off but specified that it was to be at an officer's discretion.

245.   Despite the medical restriction granted to Mr. Davis, corrections officers continued to refuse Mr. Davis's requests to have the light turned off in his cell.

246.   Due to the constant illumination, the isolation, and the stress from not being able to communicate with his wife and son, Mr. Davis had great difficulty sleeping at night while he was in the RHU.

## CAUSES OF ACTION

### Count I: 42 U.S.C. § 1983: Fourteenth Amendment – Excessive Force
### Plaintiff v. Defendants Fagan, Forshay, Wagenhoffer, Fitzpatrick, and Maurer

247.   The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

248.   Defendants knowingly and intentionally used force against Mr. Davis on December 2, 2021, when they, *inter alia*, slammed him into the wall and floor, pepper-sprayed him, and placed him handcuffs and shackles.

249.   The Defendants' actions and inactions were objectively unreasonable in light of the facts and circumstances at the time and caused Mr. Davis harm.

250.   The Defendants are liable for the force they used, for directing others to use force, and/or for failing to intervene to stop others from using excessive force.

**Count II: 42 U.S.C. § 1983: Fourteenth Amendment – Excessive Force**
**Plaintiff v. Defendants Fagan, Schweyer, Forshay, Wagenhoffer, Smith,**
**Turnberg, Klemm, and Hutson**

251.   The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

252.   Defendants knowingly and intentionally used force against Mr. Davis on December 2–3, 2021, when they caused him to be placed and/or kept in a restraint chair for approximately 9–11 hours.

253.   Mr. Davis's restraint-chair placement was objectively unreasonable in light of the facts and circumstances at the time and caused him harm.

254.   The Defendants are liable for their roles in, *inter alia*, placing Mr. Davis in the restraint chair, failing to remove Mr. Davis from the restraint chair, authorizing or directing others to place him in the restraint chair, authorizing or directing others

to keep him in the restraint chair, and/or failing to intervene to ameliorate Mr. Davis's suffering.

**Count III: 42 U.S.C. § 1983: Fourteenth Amendment – Unconstitutional Punishment and Unconstitutional Conditions of Confinement**
**Plaintiff v. Defendants Fagan, Schweyer, Forshay, Wagenhoffer, Smith, Turnberg, Klemm, and Hutson**

255.    The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

256.    As an immigrant detainee, Mr. Davis has a right to be free from punishment.

257.    Defendants' confinement of Mr. Davis in a restraint chair for approximately nine to eleven hours was not rationally related to any legitimate non-punitive government purpose.

258.    In the alternative, to the extent Defendants' confinement of Mr. Davis in a restraint chair bore some rational relationship to a legitimate non-punitive government purpose, it was excessive in light of that purpose.

259.    By placing and keeping Mr. Davis naked in a restraint chair for approximately nine to eleven hours, without penological justification, Defendants subjected Mr. Davis to conditions that exposed him to a substantial risk of serious harm and/or deprived him of the minimal civilized measures of life's necessities. The risk of harm to Mr. Davis was obvious, and Defendants were deliberately indifferent to this risk.

260.   The Defendants are liable for their roles in, *inter alia*, placing Mr. Davis in the restraint chair, failing to remove Mr. Davis from the restraint chair, authorizing or directing others to place him in the restraint chair, authorizing or directing others to keep him in the restraint chair, and/or failing to intervene to ameliorate Mr. Davis's suffering.

### Count IV: 42 U.S.C. § 1983: Fourteenth Amendment – Excessive Force
### Plaintiff v. Defendants Fagan, Forshay, Wagenhoffer, and Smith

261.   The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

262.   Defendants knowingly and intentionally used force against Mr. Davis on December 2 or 3, 2021, when they assaulted him while he was in the restraint chair.

263.   The Defendants' actions and inactions were objectively unreasonable in light of the facts and circumstances at the time and caused Mr. Davis harm.

264.   The Defendants are liable for the force they used, for directing others to use force, and/or for failing to intervene to stop others from using excessive force.

### Count V: 42 U.S.C. § 1983: Fourteenth Amendment – Equal Protection
### Plaintiff v. Defendants Fagan, Forshay, Wagenhoffer, and Smith

265.   The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

266.  As evidenced by, *inter alia*, their use of the n-word, reference to George Floyd, laughter at their co-worker's use of the n-word, and failure to intervene, Defendants' acts and omissions, as described above, were motivated by Mr. Davis's race and Defendants' anti-Black animus.

267.  Defendants thereby deprived Mr. Davis of his right to equal protection guaranteed by the Fourteenth Amendment.

### Count VI: 42 U.S.C. § 1983: First Amendment – Retaliation
### Plaintiff v. Defendants Lowe, Fagan, and Forshay

268.  The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

269.  Mr. Davis engaged in protected First Amendment activity when he requested the presence of an ICE officer and made other oral complaints about how he was being treated.

270.  Defendants Fagan and Forshay took adverse action against Mr. Davis when they falsely claimed he was suicidal, knowing this would cause him to be subjected to harsh conditions, including, *inter alia*, placement in the restraint chair and on suicide watch, without justification.

271.  Defendant Lowe took adverse action against Mr. Davis when he ordered or approved Mr. Davis's placement in an observation cell on suicide watch.

272.  Mr. Davis's protected activity was a substantial or motivating factor in Defendants' decisions to take adverse actions against him.

### Count VII: 42 U.S.C. § 1983: First Amendment – Retaliation
### Plaintiff v. Defendants Fagan, Forshay, and Smith

273.    The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

274.    Mr. Davis engaged in protected First Amendment activity when he filed grievances, grievance appeals, request slips, a PREA complaint, and a complaint with the state police.

275.    Defendant Fagan took adverse action against Mr. Davis when he directed other officers not to turn off the lights in Mr. Davis's RHU cell, knowing this would increase Mr. Davis's suffering in light of his eye injuries.

276.    Defendant Forshay took adverse actions against Mr. Davis when she filed disciplinary charges against Mr. Davis and encouraged other corrections officers to file disciplinary charges against Mr. Davis, which led to his continued placement in solitary confinement, and when she refused Mr. Davis's requests to use the law library.

277.    Defendant Smith took adverse action against Mr. Davis when he filed disciplinary misconduct charges against Mr. Davis, which led to his continued placement in solitary confinement.

278.    Mr. Davis's protected activity was a substantial or motivating factor in Defendants' decisions to take adverse actions against him.

### Count VIII: Assault and Battery under Pennsylvania Law

**Plaintiff v. Defendants Wagenhoffer, Fitzpatrick, and Maurer**

279.   The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

280.   On December 2, 2021, Defendants intentionally put Mr. Davis in reasonable and immediate fear of harmful and offensive contact and intentionally touched him in a harmful and offensive manner without his consent when they, *inter alia*, slammed him into the wall and floor, pepper-sprayed him, and placed him in overly tight handcuffs and shackles. These actions constituted assault and battery under Pennsylvania law.

281.   In assaulting and battering Mr. Davis, the Defendants engaged in willful misconduct. Their actions were neither authorized nor required by law, nor could they have in good faith believed otherwise. They acted maliciously toward Mr. Davis for the purpose of injuring him.

### Count IX: Assault and Battery under Pennsylvania Law
### Plaintiff v. Defendants Wagenhoffer and Smith

282.   The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

283.   On December 2 or 3, 2021, the Defendants intentionally put Mr. Davis in reasonable and immediate fear of harmful and offensive contact and intentionally touched him in a harmful and offensive manner without his consent when they

choked him and forcefully pulled on his leg while he was in the restraint chair. These actions constituted assault and battery under Pennsylvania law.

284.   In assaulting and battering Mr. Davis, the Defendants engaged in willful misconduct. Their actions were neither authorized nor required by law, nor could they have in good faith believed otherwise. They acted maliciously toward Mr. Davis for the purpose of injuring him.

**Count X: Intentional Infliction of Emotional Distress under Pennsylvania Law**
**Plaintiff v. Defendants Fagan, Schweyer, Forshay, Wagenhoffer, Fitzpatrick,**
**Maurer, and Smith**

285.   The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

286.   Defendants' intentional and reckless conduct on December 2–3, 2021, including but not limited to their use of force against Mr. Davis and involvement in his restraint-chair placement, were so outrageous in character and so extreme in degree as to go beyond the bounds of decency and to be regarded as utterly intolerable in a civilized society.

287.   Defendants' acts and omissions resulted in Mr. Davis suffering severe emotional distress.

288.   Defendants engaged in willful misconduct. Their actions were neither authorized nor required by law, nor could they have in good faith believed otherwise. They acted maliciously toward Mr. Davis for the purpose of injuring him.

43

## Count XI: Professional Negligence and Vicarious Liability
## under Pennsylvania Law
### Plaintiff v. Defendants Turnberg, Klemm, Hutson,
### and PrimeCare Medical, Inc.

289.   The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

290.   At all relevant times, the individual Defendants had a duty to act in accordance with the standard of care required of medical professionals and to act as a reasonable person would under the same or similar circumstances.

291.   Defendant Turnberg breached her duty as a physician when she, *inter alia*, approved Mr. Davis's placement in the restraint chair, and approved his remaining in the restraint chair for longer than eight hours, (a) without an adequate basis, (b) without examining or evaluating him, (c) without speaking with him, (d) without laying eyes on him, (e) without adequately investigating whether restraint-chair placement was necessary or appropriate, (f) without ensuring that less restrictive measures were tried, (g) without ensuring that he had an ongoing path to be removed from the restraint chair and placed in less restrictive conditions, (h) without adequately documenting the basis for her decisions, and (i) without directing that counseling, de-escalation, medication, or other mental health treatment be provided.

292.   Defendants Klemm and Hutson breached their duty as nurses through their acts and omissions before and during Mr. Davis's restraint-chair placement, by,

*inter alia*, (a) seeking approval for his initial and/or continued placement in the restraint chair without an adequate basis, (b) failing to check his vital signs with sufficient frequency, (c) recording false data in his medical records, (d) failing to record in his medical records or respond to the obvious distress he was in, (e) failing to take measures to adjust his position in the restraint chair or the position of the chair itself to reduce his pain and discomfort, (f) failing to take measures to facilitate his receiving medication or other mental health treatment, (g) failing to adequately communicate with Dr. Turnberg or other physicians, and (h) failing to take sufficient measures to facilitate his removal from the restraint chair or otherwise alleviate his suffering.

293.   As a result of the individual Defendants' acts and omissions, Mr. Davis experienced physical, emotional, and psychological harm.

294.   Defendant PrimeCare Medical, Inc., is vicariously liable for the negligence of its employees, Defendants Turnberg, Klemm, and Hutson.

## REQUESTED RELIEF

WHEREFORE, Plaintiff Damion Davis respectfully requests that the Court grant the following relief:

A.     An award of compensatory and punitive damages against all Defendants in an amount to be determined by the finder of fact;

B.    An award of nominal damages on any claim on which no compensatory

damages are awarded;

C.    Reasonable attorney's fees and costs;

D.    Such other relief the Court deems just and proper.

Respectfully submitted,

/s/ Matthew A. Feldman

Matthew A. Feldman (PA 326273)
PA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA 19106
215-925-2966
mfeldman@pilp.org

/s/ Evangeline Wright

Evangeline Wright (PA 200054)
PA INSTITUTIONAL LAW PROJECT
115 Farley Circle, Suite 110
Lewisburg, PA 17837
570-661-9044
ewright@pilp.org

*Counsel for Plaintiff*

DATE: February 12, 2024